**FILED**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA 98 NOV -6 PM 3:48
NORTHEASTERN DIVISION

U.S. DISTRICT COURT
N.D. OF ALABAMA

| | |
|---|---|
| GEORGE MILLS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Civil Action No. 97-S-0010-NE |
| | ) |
| WAL-MART STORES, INC. | ) |
| | ) |
| Defendant. | ) |

ENTERED.

NOV 0 6 1998

## MEMORANDUM OPINION

George Mills is a former employee of Wal-Mart Stores, Inc. He alleges that he was "retaliated against ... for having protested instances of race discrimination."[1] Jurisdiction is premised upon "Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. and 42 U.S.C. § 1981."[2] Plaintiff's complaint contains three claims: (1) retaliation under Title VII; (2) retaliation under § 1981; and (3) constructive discharge in violation of Title VII. The action now is before the court on defendant's motion for summary judgment.

### I. SUMMARY JUDGMENT STANDARD

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is

---

[1] Complaint at 4 ¶ 21.

[2] Id. at 1 ¶ 1.

34.

no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." "An issue of fact is 'material' if it is a legal element of the claim under the applicable substantive law which might affect the outcome of the case." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997)(citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986)). "It is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." *Id.*

The moving party has the initial burden of showing the absence of a genuine issue as to any material fact. *Id.* In determining whether this burden is met, the court must view the evidence "and all factual inferences arising from it in the light most favorable to the nonmoving party." *Id.* (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970)).

Once the movant's initial burden is met, "the burden shifts to the nonmovant to 'come forward with specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986)). In meeting its burden, "the nonmoving party may avail itself of all facts and justifiable inferences in the record taken as a whole." *Tipton v.*

2

*Bergrohr GMBH-Siegen*, 965 F.2d 994, 998 (11th Cir. 1992)(citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962)).

"'The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.'" *Tipton*, 965 F.2d at 999 (quoting *Anderson*, 477 U.S. at 255, 106 S.Ct. at 2513). Even so, a "mere 'scintilla' of evidence supporting the [nonmoving] party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990)(citing *Anderson*, 477 U.S. at 242, 106 S.Ct. 2505). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita*, 475 U.S. at 587, 106 S.Ct. at 1356 (citation omitted).

With those standards in mind, the court now proceeds to summarize the undisputed facts or, if disputed, to frame them in a light most favorable to plaintiff.

## II. STATEMENT OF FACTS

George Mills began his employment with Wal-Mart Stores, Inc., in 1989, when district manager, Bob Sandlin, hired him as an assistant manager of the Jasper, Alabama Wal-Mart store.[3]   Mr. Sandlin remained Mr. Mills' district manager for approximately two

---

[3] Plaintiff's Deposition at 11.

3

years. No problems arose between the two men during that period.[4] Mills was subsequently transferred to the Huntsville-Jordan Lane Wal-Mart as assistant manager, whereupon Gregg May became the district manager of Mills.

At some point that is not established in the record, George Mills became store manager of store number 433 located on North Memorial Parkway in Huntsville, Alabama.[5] During 1994, Shyvonne Parker, an assistant manager, was transferred to Mills' store. Ms. Parker is of African-American heritage.

Bob Sandlin became Mills' district manager again during January of 1995, replacing Gregg May.[6] In late February, 1995, on a visit to Mills' store, Sandlin allegedly told him "we have got to get rid of that nigger," referring to Shyvonne Parker.[7] Plaintiff and Bob Sandlin are white males, and at the time Sandlin allegedly made this comment, Ms. Parker was the only African-American assistant manager working in Mills' store. Sandlin instructed Mills to start building a case to justify Parker's termination.[8] Mills did not directly respond to Sandlin's comment; the following day, however, Mills contacted Mike Cantrell, store manager of the

---

[4] *Id.* at 12. No specific date is given by either party as to the time Sandlin was Mills' district manager, except 1989.

[5] *Id.* at 16-17.

[6] *Id.* 11, 16.

[7] *Id.* at 12.

[8] Plaintiff's Affidavit at 1.

4

Drake Avenue Wal-Mart store, to express his concern about Sandlin's racial slur.[9]    Cantrell allegedly responded that he was not surprised by the comment, because Sandlin also had said white men "don't have rights any more" in front of one of Cantrell's African-American assistant managers on the same day.[10]   Mills told Cantrell about his plan to report Sandlin to upper management.   Cantrell responded that, if Mills went ahead with his plan, his "career with Wal-Mart would be over."[11]

Wal-Mart has an established policy against all types of discrimination,[12] as well as an "Open Door Policy"[13] for employees to report workplace problems.

After speaking with Mike Cantrell, George Mills called Mel

---

[9] Plaintiff's Deposition at 17-18.

[10] *Id.* at 18

[11] Plaintiff's Affidavit at 2.

[12] The Wal-Mart Associate Handbook states:  "[o]ur commitment to equal opportunity for all associates is reinforced by policy and by actions. We do not tolerate discrimination of any kind.  **Not only is discrimination against our beliefs, it's against the law.**" Defendant's Exhibit C, Exhibit 3 (emphasis in original.)

[13]   Wal-Mart's Open Door-Open Mind Policy reads as follows:

> Our Open Door-Open Mind policy allows each of us the chance to be heard. It says that if you have an idea or problem, you can go to your Coach to talk about it without fear of retaliation.  If you don't feel satisfied with the response, or if your Coach is the source of your problem, you can go to his or her supervisor.

> You can go up to each level of management, including our Company's top leaders, with your idea or concern.  Remember, while Open Door - Open Mind promises that you will be heard without retaliation, it cannot promise that your opinion will always prevail.

Defendant's Exhibit c, Exhibit 3.

5

Redman, divisional vice president of Wal-Mart, about Sandlin's offensive comments.[14]  Redman promised to speak with Don Bland,[15] the regional vice president and Sandlin's immediate supervisor.[16] Redman and Bland later engaged in a three-way conference telephone call with Mills to discuss Sandlin's comments.    During this conversation George Mills described the comment and the circumstances surrounding it, as well as the comment allegedly made at Mike Cantrell's store.  Mills expressed his concern about the possibility of "reprisal" by Sandlin.[17]  Redman allegedly said that Mills "was as safe as a baby in their [sic] mother's arms."[18]

Following the conference call, Sandlin was summoned to Bentonville, Arkansas[19] for "coaching."[20]  Mel Redman then called

---

[14] Plaintiff's Deposition at 19.

[15] Don Bland is of African-American heritage.  Langford Declaration at 2.

[16] Plaintiff's Deposition at 19-20.

[17] Id. at 21-24.

[18] Id. at 24.

[19] The corporate headquarters of Wal-Mart Stores, Inc.

[20] Plaintiff's Deposition at 25.  The term "coaching" is defined in the associate handbook as follows:

People generally want to perform well and be successful.   Our Coaching for Improvement process is designed to inform an associate when she or he is not meeting requirements and expectations of their position.

If an associate's performance or conduct falls below the expectations of his or her position, then the associate is informed of the problem and encouraged to take responsibility for his or her actions.  This process will include developing a plan of action for improving performance to the required level, or changing conduct.

There are, however, certain actions of misconduct which may result in immediate termination - Coaching for Improvement will not be used

6

Mills and told him that Sandlin needed to discuss some "things,"
but would not specify what those "things" were. Redman also told
Mills that Sandlin had admitted making the statement in Mike
Cantrell's store, but could not recollect making the comment
concerning Ms. Shyvonne Parker. According to Don Bland, Sandlin
was not disciplined, "[b]ecause there was nothing to substantiate
Mills' allegation, and no independent corroboration of the comment.
. . ."[21]

Upon Sandlin's return, Mills telephoned him, and Sandlin
requested that they meet.[22] During that meeting, Sandlin asked
Mills whether he thought they could continue working together, and
whether Mills was trying to have him fired. Mills responded that
he believed they could continue their working relationship.[23]

Two or three weeks after their meeting, Sandlin visited Mills'
store to determine whether it was prepared for inventory. Sandlin
concluded the entire store was not ready. Mills alleges that
Sandlin determined Ms. Parker's area was not prepared, and that he
directed Mills not to give Parker any extra help.[24] According to
Mills, Sandlin further directed him to begin documenting instances

_____

to address gross misconduct. . . .

Defendant's Exhibit C, Exhibit 3.

[21] Bland Declaration at 1.

[22] Plaintiff's Deposition at 26-28.

[23] Id. at 28.

[24] Id. at 29-30.

7

of deficient performance by Parker, and to forward copies of the documentation to Sandlin for review.[25] In June, 1995, Shyvonne Parker was demoted to an hourly wage position based on her poor performance. Prior to her demotion, Sandlin telephoned John Simmons, assistant to regional vice president Don Bland, to discuss Ms. Parker's demotion. Mills was present during the conversation, and Simmons approved of the demotion.[26] Following this telephone conversation, Mills and Sandlin met with Ms. Parker to inform her of the demotion. According to Mills, Sandlin believed Ms. Parker would be transferred out of his district upon her demotion. When this did not occur, Sandlin became angry and allegedly said to Mills "I'm going to have to keep her ass anyway."[27] Ms. Parker resigned a week or two later.[28]

Following her resignation, Ms. Parker returned to Mills' store on several occasions and threatened to sue him. Ms. Parker believed Mills was the person responsible for her demotion. According to plaintiff, when he spoke to John Simmons regarding Ms. Parker's threats: "[Simmons] told me not to worry about it that finally somebody had enough guts to take her out."[29]

---

[25] *Id.* at 13-15.
[26] *Id.* at 37-38.
[27] *Id.* at 50-51.
[28] *Id.* at 40, 41, 50.
[29] *Id.* at 73.

8

A few weeks later, Sandlin telephoned Mills at home, enraged about the condition of the lawn and garden shop. Following this telephone conversation, Mills called either Mel Redman or Don Bland,[30] informing them of what had transpired and that he considered Sandlin's actions to be in retaliation for Mills' act of reporting Sandlin's racist remarks.[31] That precipitated another telephone conference: the participants were George Mills, Bob Sandlin, Don Bland, and Judy Langford, regional personnel manager.[32] Prior to that telephone conference, Mills had confronted Sandlin about his belief that Sandlin was retaliating against him. Sandlin confirmed he no longer trusted Mills, because Mills had "turned him in." According to Mills, Sandlin also voiced his distrust during the conference call:

    A: [Don Bland] says that he is ready to make a decision on this and will make a decision on it and wants to know what happened. And he allowed Sandlin to talk first. Judy Langford is on this, too.

    Q: And Sandlin said what?

    A: And Sandlin was indicating that he did not - he said he did not trust me and did not want to work with me. Don Bland asked him why, was it because of me turning him in.

    Q: Bland said that?

---

[30] *Id.* Plaintiff testified that he could not recall who he spoke with during this conversation.

[31] *Id.* at 53-55.

[32] *Id.* at 55.

9

A: Yes. And he [Sandlin] said, yes. And he [Bland] also asked Sandlin, he said to Sandlin, he said, now, I know you have got hard feelings against him for what happened. And he said, yes. And then he said he didn't want to work with me anymore.

Q: And what did Bland say to that?

A: Bland asked me what my side was. And I told him that he [Sandlin] had called me at home yelling. And then I told him about the confrontation down at the office. And that I feared it was a hostile situation. And then Sandlin was interrupting or something on the conference call and Bland told him to him, to let me have my say so. Then at that point - and Don Bland made the decision. And he said, well, he said, I'm going to make this decision. And he said, since it is easier to move a store manager than it is a district manager, we are going to move you, George.

Q: And what was said about that?

A: And I said, why am I going to have to move? And he said, because of the simple fact it's easier to move a store manager than it is a district manager. And instructed Judy Langford to find me a store that I was agreeable upon in this move and asked me what area if I had a choice to move to.

(Plaintiff's Deposition at 59-61.) Mills later decided he did not want to be transferred, however, and wrote Don Bland regarding his decision.[33] As a result, Judy Langford called Mills and informed him that he would not be transferred as per his request.[34]

On October 2, 1995, Sandlin issued a performance evaluation to Mills. The overall rating on the evaluation was "didn't meet

---

[33] Id. at 65. Plaintiff also forwarded copies of the letter to Ed Nagy, who replaced Mel Redman upon his retirement, Maxie Carpenter, head of personnel of Wal-Mart, and Judy Langford. See Plaintiff's Deposition at 65; Exhibit 1.

[34] Plaintiff's Deposition at 68.

10

expectations."[35]     Sandlin   indicated   Mills'   "areas   needing

improvement" were:

1. Morale was consistently below average as indicated by associate surveys done in March and July.

2. Emphasis needed to be placed on PI (perpetual inventory) scorecard.

3. Emphasis needed to be placed on M.O.P.R. (Monthly Operational Performance Review). Store has not scored 95% on any of the three district M.O.P.R.'s.

4. Freight processing was not up to standard and that there was too much overstock.

5. The store was consistently behind on modulars.

6. The store consistently has the largest amount of outstanding price changes.

7. The store needed to follow up on shrinkage plans.

(Plaintiff's Deposition, Exhibit 2.) Mills disagrees that morale

was low, and that his store had the largest number of outstanding

price changes in the district. He claims that the store followed

a shrinkage plan. He also did not know what a "PI scorecard" was.

Mills agreed with the other areas noted as "needing improvement."[36]

A follow-up evaluation was performed on November 9, 1995, at

which time Sandlin determined morale, M.O.P.R. scores, and

outstanding price changes had improved.[37] On November 13, 1995, Bob

Sandlin was demoted by Don Bland, based on the below standard

---

[35] Plaintiff Deposition, Exhibit 2.

[36] Plaintiff's Deposition at 80-87.

[37] Plaintiff's Deposition, Exhibit 2.

11

stores in his district, which included Mills' store. Tony Stewart was transferred from another district in Alabama to replace Sandlin.

According to Mills, several significant retaliatory events occurred after Tony Stewart replaced Sandlin as district manager. Stewart made his initial visit to Mills' store on November 19, 1995.[38] He returned the next day, accompanied by John Simmons.[39] During this visit, Stewart and Simmons noted problems occurring throughout Mills' store.[40] According to Stewart, "Mills admitted that he and his staff had not been doing a good job on clearance merchandise."[41]

The roof in the lawn and garden area of Mills' store collapsed on November 26, 1995. Mills called Tony Stewart and store planning to arrange for the necessary repairs to be made the next day. He and Stewart agreed that the merchandise located in the lawn and garden area would be moved into the parking lot, with a guard assigned to secure the merchandise.[42] Approximately 150 pallets of merchandise were placed in the parking lot.[43]

---

[38] Stewart Declaration at 1.

[39] Id.

[40] Id.

[41] Id. at 2.

[42] Plaintiff's Deposition at 147-148.

[43] Defendant's Exhibit E, Exhibit 1 (Decision-Making Day form); Judy Langford testified that 150 pallets of merchandise would fill at least 3 tractor trailer truck loads. Langford Deposition at 34.

12

The following day, November 27, 1995, the work force scheduled
to repair the roof did not arrive. Mills called Stewart, and they
agreed to move the merchandise back into the building. Stewart
indicated he would visit the store between 5:30 and 6:00 p.m. When
Stewart did not arrive at the time specified, however, Mills went
home for the evening, leaving James Poteet, an assistant manager,
in charge of returning the merchandise to the store. Stewart
arrived at Mills' store between 6:30 and 7:00 p.m., and found the
lawn and garden merchandise still stacked in the parking lot.
Stewart called Don Bland and Judy Langford concerning the
situation.[44] Stewart then called Mills at home, and he returned to
the store. When Mills arrived, Stewart issued him a "decision-
making day write-up" based on this incident, in addition to the
continuing poor conditions of his store.[45]

A "decision-making day" normally is the final disciplinary
step prior to termination or demotion. The disciplinary steps may
be altered by the severity of the situation.[46] The form indicated
Mills would be demoted or terminated if the problems were not

---

[44] Stewart Declaration at 3.

[45] Plaintiff's Deposition at 149-150. Judy Langford testified that the
amount and value of the merchandise in the parking lot insufficiently secured
would be severe enough for immediate termination. Langford Deposition at 25-29.

[46] According to Judy Langford: "[d]epending on the severity of the
performance problem or offense, a person can be given a decision[-]making day or
can be demoted or terminated without resort to prior levels of coaching such as
first or second written coaching." Langford Declaration at 3.

13

corrected.[47] Mills signed the form which contained his "plan of action," requiring that he resolve all problems no later than December 7, 1995.[48] *Id.* The corrective action to be taken is listed in the "decision-making day write-up plan of action" as follows:

1. Stockroom will be organized by Dept and seasonal merchandise separated and posted to the sales floor. Asst. Mgr. Pam Davis will be responsible for this being done by December 10th.

2. GreenHouse will be cleaned out by December 7th. Merchandise will be push to the Floor by December 7th. This will be the responsibility of Asst. Mgr. Les McCarta.

3. North Stockroom will be emptied and layaways filed in bins by December 5th. [T]his will be the Responsibility of James Poteet.

4. No Merchandise will be left outside the fenced area over 12 hours without written permission from the Dist. Mgr. Tony Stewart.

5. Garden Center will be cleaned up of any old summer merchandise By December 5th. Straighten and Organized this will be the Responsibility of Curtis Stewart Asst. Mgr.

(Plaintiff's Deposition, Exhibit 9.)

After being issued the "decision-making day write-up," Mills presented Stewart with a charge of discrimination which he intended

---

[47] Plaintiff's Deposition, Exhibit 9.

[48] A "plan of action" is the employee's written outline of how he or she is going to correct the problem. Stewart Declaration at 3.

14

to submit to (but had not then had filed with) the EEOC.[49]

On December 12 and 13, 1995, the district loss prevention supervisor, G.B. Martin, conducted an associate opinion survey at Mills' store, using the standard opinion survey form.[50] Approximately 130 hourly employees participated in the survey. The survey results rated Mills below the "meets expectations" level.[51] According to Stewart, "several of the surveys revealed that the employees did not receive any direction from Mills, and that he spoke [to] them [in] an abusive and demeaning fashion."[52]

On December 15, 1995, Mills was demoted to assistant manager. The decision to demote Mills was made by Stewart and Bland.[53] The demotion was based upon his failure to accomplish the "plan of action" contained in the "decision-making day write-up," and, his lack of leadership indicated through the employee opinion survey.[54] During the demotion meeting, Mills informed Stewart he considered the action retaliatory. Stewart did not respond to Mills' assertion.[55] Mills was transferred to the Fayetteville, Tennessee

---

[49] Plaintiff's Affidavit at 7-8, Exhibit 6. According to Stewart, he received the copy of the charge at 8:30 p.m. the night of November 27, 1995. Stewart Declaration at 4.

[50] Plaintiff's Deposition at 159-160.

[51] Langford Deposition at 89, Exhibit 13.

[52] Stewart Declaration at 5.

[53] Id. at 5.

[54] Plaintiff's Depositon, Exhibit 9 at 2.

[55] Plaintiff's Deposition at 165.

15

Wal-Mart store, approximately 30 miles from Huntsville, Alabama. When he arrived for work in Fayetteville on December 16, 1995, Mills telephoned Stewart, informed him that the commute was too far, and resigned.[56]

On February 23, 1996, Mills filed the EEOC charge he had shown to Stewart on November 27, 1995. Upon receiving his right-to-sue letter, Mills filed the present action.

## III. DISCUSSION

### A. Retaliation Under Title VII

Section 704(a) of Title VII provides protection to those who oppose or participate in uncovering an employer's discriminatory practices. That provision provides, in pertinent part, that:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because he [the employee] has opposed any practice made an unlawful employment practice by this [title], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this [title].

Section 704(a), now codified at 42 U.S.C. § 2000e-3(a), thus recognizes two bases for a claim of retaliation: one for opposition to prohibited practices, and one for participation in protected activity. Plaintiff's claim in this case arises under the opposition clause.

Plaintiff bears the ultimate burden of proving, by a

---

[56] *Id.* at 169-170.

16

preponderance of the evidence, that Wal-Mart intentionally retaliated against him because he opposed employment practices made unlawful by Title VII. That can be done either by direct or circumstantial evidence. "When there is direct evidence that [retaliation] was a motivating factor in the challenged employment decision, the appropriate analysis is different from that employed in a case where only circumstantial evidence is available." *Trotter v. Board of Trustees of the University of Alabama*, 91 F.3d 1449, 1453 (11th Cir. 1996)(citing *Bell v. Birmingham Linen Service*, 715 F.2d 1552, 1556 (11th Cir. 1983), *cert. denied*, 467 U.S. 1204, 104 S.Ct. 2385 (1984); *Haynes v. W.C. Caye and Co., Inc.*, 52 F.3d 928, 931 (11th Cir. 1995)).

## 1. Direct evidence of retaliation

"Statements indicating ... [retaliatory] bias on the part of a decisionmaker in an employment setting can constitute direct evidence of ... retaliation in Title VII cases." *Trotter v. Bd. of Trustees*, 91 F.3d at 1453 (emphasis supplied)(citations omitted). Statements of decisionmakers directly related to the decisional process are direct evidence of discrimination. *See, e.g., Bell v. Birmingham Linen Service*, 715 F.2d 1552 (11th Cir. 1983)(plaintiff's supervisor made a direct statement of bias when rejecting plaintiff for promotion), *cert. denied*, 467 U.S. 1204

17

(1984); *Thompkins v. Morris Brown College*, 752 F.2d 558, 561, 563-564 (11th Cir. 1985)(statement by decisionmaker that he saw no need for woman to have second job constituted direct evidence of discriminatory intent).

Neither party argues Wal-Mart acted with retaliatory intent. The court notes, however, that had the issue been argued, the second telephone conference which took place between George Mills, Bob Sandlin, Don Bland, and Judy Langford could be construed as evidence of a retaliatory motive or intent. In that conversation, Sandlin admitted he did not trust Mills, and did not want to continue working with him, because Mills "turn[ed] [Sandlin] in."[57] Reliance upon Sandlin's comments to support a showing of direct evidence of retaliation is misguided, however.

The Eleventh Circuit includes supervisors within the definition of "employer" - but only if the supervisor is delegated final authority to make employment decisions. *See, e.g., Goldsmith v. City of Atmore*, 996 F.2d 1155, 1162 (11th Cir. 1993); *Williams v. City of Montgomery*, 742 F.2d 586, 589 (11th Cir. 1984). In like manner, the Fifth Circuit construes the term "employer" as including supervisors, but only when they "participated in the decision-making process that forms the basis of the [retaliation]." *Hamilton v. Rodgers*, 791 F.2d 439, 443 (5th Cir. 1986) (citations

---

[57] Plaintiff's Deposition at 59-61.

18

omitted); *see also, e.g., Harvey v. Blake,* 913 F.2d 226, 227 (5th Cir. 1990)("immediate supervisors are Employers when delegated the employer's traditional rights, such as hiring and firing").

In the instant action, even though Sandlin was Mills' supervisor at the time he made the retaliatory remarks, Sandlin was not the final decisionmaker when Mills was ultimately demoted. Sandlin himself had been demoted to store manager, prior to Mills' demotion to assisant manager at the Fayetteville, Tennessee Wal-Mart store. No evidence was presented to show Sandlin participated in the decision to demote Mills. To the contrary, Judy Langford states in her declaration: "Sandlin was not involved in the decision to demote Mills."[58]

There also is no evidence indicating either that Stewart had knowledge of Mills' opposition to Sandlin's racially derogatory remarks, or that Sandlin's direct statements manifesting a retaliatory motive on his part were considered or even known to Stewart when making his decision to demote Mills. Plaintiff bases his argument on the fact that Stewart and Sandlin talked "all the time" prior to Sandlin's demotion. Plaintiff therefore surmises that, because they allegedly spoke with each other, Sandlin "must

---

[58] Langford Declaration at 2.

19

have" told Stewart about his problems with plaintiff.[59] Stewart,
however, states:

> [w]hen I first visited Mills' store, I did not know
> that he had complained about discrimination. I did not
> know that he had complained about discrimination until he
> handed me a copy of the EEOC charge after I gave him the
> decision-making day write-up. Prior to that time, I had
> no knowledge of the matters contained in the EEOC charge.
> Prior to becoming district manager of the district
> including that store, I had no involvement in any
> evaluations of that store, any of Mills' performance
> evaluations, ... or any conflicts between Mills and the
> prior district manager.

(Stewart Declaration at 6.) Furthermore, the final decision to
demote plaintiff was made by Stewart and Bland.[60] Plaintiff,
nevertheless, makes no claims of retaliation against Bland.

Plaintiff's assertions are, at best, circumstantial evidence
of Stewart's knowledge, but do not rise to the level necessary to
be considered direct evidence of a retaliatory motive on the part
of Wal-Mart. Thus, plaintiff has presented no direct evidence of
intentional retaliation by Wal-Mart.

### 2. Circumstantial evidence of retaliation

Normally, a plaintiff does not possess direct evidence of the
employer's motive. "There will seldom be eyewitness' testimony as
to the employer's mental processes." *United States Postal Service*

---

[59] Plaintiff's Affidavit at (unnumbered pages) 7-8.

[60] Stewart Declaration at 5.

20

*Board of Governors v. Aikens*, 460 U.S. 711, 716, 103 S.Ct. 1478, 1482 (1983). When a plaintiff's evidence is circumstantial in nature, the Supreme Court has developed a three stage framework for focusing the inquiry. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). First, a plaintiff must establish a *prima facie* case. If a plaintiff establishes a *prima facie* case, then at the second stage of analysis the burden of production shifts to defendant to rebut the presumption of intentional discrimination thus raised by articulating legitimate, nondiscriminatory reasons for the employment action. *Burdine*, 450 U.S. at 253, 101 S.Ct. at 1093. If defendant does so, then in the final step of the inquiry plaintiff must have an opportunity to show by a preponderance of the evidence that defendant's stated reasons merely are pretexts for unlawful, discriminatory motives. *Id*.

### 1. Plaintiff's *prima facie* case

To establish a *prima facie* case of retaliation under 42 U.S.C. § 2000e-3(a), a plaintiff must show: (1) he engaged in statutorily protected expression or activity; (2) he suffered an adverse

21

employment action; and (3) the adverse employment action was causally related to the protected expression or activity.  *E.g.*, *Meeks v. Computer Associates International*, 15 F.3d 1013, 1021 (11th Cir. 1994); *Goldsmith v. City of Atmore*, 996 F.2d 1155, 1163 (11th Cir. 1993).

In addition, when (as in this case) a complaint of retaliation is based upon the opposition clause of 42 U.S.C § 2000e-3(a), the Eleventh Circuit also requires that plaintiff to demonstrate a good faith, reasonable basis for believing that the underlying, allegedly discriminatory conduct which he opposed (or about which he complained) was actually unlawful.   *Little v. United Technologies*, 103 F.3d 956 (11th Cir. 1997).

> We previously have recognized that a plaintiff can establish a prima facie case of retaliation under the opposition clause of Title VII if he had a good faith, reasonable belief that the employer was engaged in unlawful employment practices. *See Rollins v. State of Fla. Dept. of Law Enforcement*, 868 F.2d 397, 400 (11th Cir. 1989). It is critical to emphasize that a plaintiff's burden under this standard has both a subjective and an objective component. A plaintiff must not only show that he *subjectively* (that is, in good faith) believed that his employer was engaged in unlawful employment practices, but also that his belief was *objectively* reasonable in light of the facts and records presented. It thus is not enough for a plaintiff to allege that his belief in this regard was honest and bona fide; the allegations and record must also indicate that the belief, though perhaps mistaken, was objectively reasonable.

> A plaintiff, therefore, need not prove the

22

> underlying discriminatory conduct that he opposed was actually unlawful in order to establish a prima facie case and overcome a motion for summary judgment; such a requirement "[w]ould not only chill the legitimate assertion of employee rights under Title VII but would tend to force employees to file formal charges rather than seek conciliation of informal adjustment of grievances." *Sias v. City Demonstration Agency*, 588 F.2d 692, 695 (9th Cir. 1978). *See also Payne v. McLemore's wholesale & Retail Stores*, 654 F.2d 1130, 1140 (5th Cir. Unit A Sept. 1981)("To effectuate the policies of Title VII and to avoid the chilling effect that would otherwise arise, we are compelled to conclude that a plaintiff can establish a prima facie case of retaliatory discharge under the opposition clause of [Title VII] if he shows that he had a reasonable belief that the employer was engaged in unlawful employment practices."), *cert. denied*, 455 U.S. 1000, 102 S.Ct. 1630, 71 L.Ed.2d 866 (1982).

*Little*, 103 F.3d at 960 (emphasis in original)(footnote omitted); *see also Silver v. KCA, Inc.*, 586 F.2d 138 (9th Cir. 1978). Neither party addressed this issue. Nevertheless, defendant does not dispute the first element of a *prima facie* case. Wal-Mart limits its arguments in brief to the third element. Accordingly, the court will assume that plaintiff possessed the requisite good faith, objectively reasonable basis for believing that his district manager had subjected one of his assistant managers to race discrimination, and that he accordingly engaged in a statutorily protected expression or activity when he complained to Wal-Mart's divisional vice president of such alleged unlawful conduct.

The second element also is not disputed by defendant. Rather, Wal-Mart argues that Mills cannot establish a causal linkage

23

between his opposition to prohibited practices and his subsequent demotion and transfer.

When a plaintiff fails to present any evidence of a causal linkage between his protected expression and the adverse employment action allegedly inflicted in retaliation therefor, the court must dismiss the claim. *Bailey v. USX Corp.*, 850 F.2d 1506, 1508 (11th Cir. 1988); *McCollum v. Bolger*, 794 F.2d 602, 610 (11th Cir. 1986); *Hamm v. Members of Board of Regents of State of Florida*, 708 F.2d 647, 654 (11th Cir. 1983).

The causal linkage requirement is interpreted broadly by the Eleventh Circuit: "a plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated." *Meeks*, 15 F.3d at 1021 (quoting *EEOC v. Reichhold Chemical, Inc.*, 988 F.2d 1564, 1571-72 (11th Cir. 1993)). The causal linkage may be inferred from circumstantial evidence. *See, e.g., Goldsmith*, 996 F.2d at 1163 ("At a minimum, a plaintiff must generally establish that the employer was actually aware of the protected expression at the time it took adverse employment action. ... The defendant's awareness ... may be established by circumstantial evidence.").

The linkage has been deemed established, for example, where only a short period of time passed between the protected expression

24

or activity and the adverse employment action. *See Holland v. Jefferson National Life Insurance Co.*, 883 F.2d 1307, 1314-15 (7th Cir. 1989)(for purposes of establishing a *prima facie* case, the "telling" temporal sequence of events — plaintiff's complaint followed shortly by adverse employment actions — demonstrate a causal link).

George Mills argues a causal linkage is demonstrated by the temporal proximity between his protected conduct and the alleged retaliatory acts: *i.e.*, plaintiff reported Bob Sandlin's offensive comments in late February, 1995, and the employment actions about which he complains began some 10 months later, during December of 1995. He also argues the temporal proximity between his exhibition of a copy of the charge of discrimination he intended to file with the EEOC to Tony Stewart during November of 1995, and his demotion approximately two weeks later. This charge, however, was shown to Stewart after Stewart slapped plaintiff with a "decision making-day write-up." Plaintiff also has failed to demonstrate that Stewart had any knowledge of plaintiff's opposition to Sandlin's racially insensitive remarks prior to that event.

As stated previously, plaintiff's conjectural belief that Stewart knew about his complaint prior to the EEOC charge rests solely on his own assertion that, because Stewart and Sandlin spoke to one another on occasion, Sandlin "must have" mentioned his

25

problems with the plaintiff. Plaintiff, however, presents no evidence supporting his assertion, and the only evidence before the court is to the contrary. Stewart avers he had no knowledge of any problems between Mills and Sandlin prior to Mills handing him the EEOC charge on November 27, 1995. Inasmuch as plaintiff cannot demonstrate that Stewart had any knowledge of that protected conduct, there can be no causal linkage with Stewart's "decision-making day write-up."

Further, such evidence does not, by itself, suggest a causal relationship. In *Davidson v. Midelfort Clinic, Ltd.*, 133 F.3d 499 (7th Cir. 1998), the Seventh Circuit refused to find a causal linkage, even though only two months separated plaintiff's filing of suit from the termination of her employment.

> A "'telling temporal' sequence" can establish that nexus [requirement of a *prima facie* retaliation claim], *Holland v. Jefferson Nat'l Life Ins. Co.*, 883 F.2d 1307, 1315 (7th Cir. 1989), but by "telling" we mean that the employer's adverse action follows fairly soon after the employee's protected expression. *McClendon v. Indiana Sugars, Inc.*, 108 F.3d 789, 796-97 (7th Cir. 1997). As the period of time separating the two lengthens, the hint of causation weakens. *Id.* at 797. [Plaintiff's] discharge occurred five months after she filed her charge of discrimination [and just two months after she filed suit [61]], and we have previously concluded that when so

---

[61] See Davidson v. Midelfort Clinic, Ltd., 133 F.3d 499, 504 (7th Cir. 1998):

On May 17, Davison filed a complaint with the EEOC and the Wisconsin Equal Rights Division claiming that Midelfort had discriminated against her on the basis of her disability. After receiving a

26

> much time passes before the adverse action takes place,
> the order in which the events occurred does not by itself
> suggest a causal link between them. *See Hughes v.*
> *Derwinski*, 967 F.2d 1168, 1174-75 (7th Cir. 1992)(four
> months); *Juarez v. Ameritech Mobile Communications, Inc.*,
> 957 F.2d 317, 321 (7th Cir. 1992)(nearly six months).

*Davidson*, 133 F.3d at 511; *see also, e.g., Krouse v. American*

*Sterilizer Co.*, 126 F.3d 494, 503 (3rd Cir. 1997)("the timing of

the alleged retaliatory action must be 'unusually suggestive' of

retaliatory motive before a causal link will be inferred."); *Rio v.*

*Runyon*, 972 F. Supp. 1446 (S.D. Fla. 1997)(seven months between

opposition and termination too remote to raise causal inference).

Plaintiff further attempts to establish a causal link by

claiming Sandlin's retaliation began soon after he reported Sandlin

to management. Plaintiff presents no evidence, nevertheless, of

any adverse employment action taken by Sandlin against him. In

fact, Sandlin was demoted after plaintiff reported him, and a new

district manager, Tony Stewart, began supervising plaintiff's

store. Plaintiff's claims of retaliation are based on Stewart's

actions which resulted in his demotion. The record before the

court also demonstrates plaintiff received similar criticisms of

---

> right-to-sue letter from the EEOC, Davidson filed this suit on
> August 1, 1995, alleging that Midelfort had violated the ADA by
> refusing to accommodate her disability. On October 13, Skold and
> Marten fired Davidson. ... Davidson subsequently amended her
> complaint in this litigation to add the charge that she was fired in
> retaliation for pursuing her rights under the ADA.

27

his performance by district managers both prior to and after Sandlin.[62]

Accordingly, plaintiff has not presented a *prima facie* case. Plaintiff having failed to present a *prima facie* case, no inference of discriminatory retaliation arises and this case is due to be dismissed.

### 2. Wal-Mart's legitimate, nondiscriminatory reasons

Even if the court were to assume from plaintiff's evidentiary submission that he had demonstrated a *prima facie* case, defendant still presents legitimate, nondiscriminatory reasons for all of its actions which are not effectively refuted by plaintiff.

Wal-Mart first asserts that plaintiff was demoted on December 15, 1995, because of his failure to correct the problems listed in the "decision-making day write-up."[63] In addition, defendant conducted an associate opinion survey on December 12 and 13, 1995. Defendant used its standard opinion survey form, and the survey was administered by the loss prevention supervisor, G.B. Martin, who

---

[62] *See* Defendant's Exhibit 3 (Performance Appraisal Dated September 12, 1994); Defendant's Exhibit 7 (Memo from Gregg May to George Mills dated March 31, 1994); Defendant's Exhibit 8 (Associate Confidential Counseling Record - Incident Form dated April 4, 1990).

[63] On November 20, 1995, Tony Stewart and John Simmons toured plaintiff's store at which time the problems in the lawn and garden area and other areas throughout the store were discovered. These same problems, particularly the lawn and garden area, were the subject of the November 27, 1995, "decision-making day write-up."

28

plaintiff has not shown was aware of his prior complaints. The results of the survey indicated serious criticisms of plaintiff's management skills by the store's employees. Moreover, prior to Mills' demotion, two of his assistant managers, Pam Davis and Les McCarter, requested transfers to stores away from Mills. Pam Davis met with Judy Langford to discuss Mills treatment of her. According to Langford, "Davis told [Langford] treated her terribly and belittled her in front of hourly employees. She wanted to transfer to get away from Mills."[64]

Defendant also cites the similar disciplinary treatment of other store managers in the Huntsville area who had not engaged in oppositional conduct. Both Carey Pitcock and Mike Cantrell, managers of store numbers 434 and 375 respectively, received below standard evaluations by Bob Sandlin on the same day as plaintiff. Pitcock and Cantrell also were written up by Sandlin for below standard store conditions on November 13, 1995. As a result of those write-ups, Carey Pitcock was demoted from store manager to assistant manager on December 9, 1995; Mike Cantrell resolved the problems in his store, however, and thereby was allowed to retain his position as store manager.[65]

---

[64] Langford Declaration at 3.

[65] *See* Defendant's Exhibit C ¶ 7, Exhibit 2; Defendant's Exhibit D ¶ 6.

29

Finally, defendant contends that, contrary to plaintiff's argument that management suddenly began to micro-manage him after his opposition to Sandlin's conduct, district managers before and after Sandlin had the same criticisms of plaintiff's performance.[66]

Thus, defendant has met its burden of articulating nondiscriminatory reasons for plaintiff's demotion, and, has directed the court to specific, admissible evidence supporting those reasons. Any presumption of retaliation which would have been raised by a *prima facie* showing now "drops from the case." *St. Mary's Honor Center*, 509 U.S. at 509, 113 S.Ct. at 2747 (quoting *Burdine*, 450 U.S. at 255 n. 10, 101 S.Ct. at 1095 n. 10).

### 3.    Plaintiff's showing of pretext

In an attempt to rebut defendant's contention that he was demoted for his job performance, plaintiff argues that Tony Stewart's actions as district manager were unusual. Plaintiff contends Stewart expended an inordinate amount of time and effort in an attempt to find deficiencies in the operations of plaintiff's store. Plaintiff further contends that on November 27, 1995, after he and Stewart agreed to move the lawn and garden area merchandise into the parking lot, Stewart arrived at plaintiff's store and issued plaintiff a "decision-making day write-up." Plaintiff also

---

[66] *See* note 62 supra.

30

argues that the opinion survey was not conducted fairly, and that
he was given far less time to remedy problems in his store than
other managers.

However, plaintiff does not present any evidence to support is
contention of pretext, other than conclusory statements. The
record before the court establishes that Tony Stewart initially
visited plaintiff's store on November 19, 1995. He and John
Simmons returned on November 20, 1995.[67] The next time Stewart was
present at plaintiff's store was on November 27, 1995. The record
also establishes that plaintiff agreed to move the merchandise back
into the building when the work force did not arrive to repair the
lawn and garden roof. When Stewart arrived at plaintiff's store on
November 27, 1995, the merchandise remained in the parking lot.
This failure was the basis for the "decision-making day write-up."

With regard to the associate opinion survey, plaintiff
contends the survey was not conducted fairly. Plaintiff again
presents no evidence that the survey was designed to elicit
negative responses about him other than his own assertion.

Plaintiff also argues he was given far less time to remedy his
store's problems than other managers. The evidence before the
court is to the contrary, however. Both Carey Pitcock and Mike

---

[67] See note 63 supra.

31

Cantrell were given "seven days to correct specific problems" and "thirty days to improve all below standard store conditions" in their performance evaluations dated November 13, 1995.[68]  Pitcock was demoted to assistant manager for his failure to correct all problems 26 days later, on December 9, 1995.

Plaintiff was allowed between eight and thirteen days in his "decision-making day write-up" to correct the specific problems with his store.[69]  He was not demoted until December 15, 1995, some eighteen days after the issuance of the "decision-making day write-up."  It is clear, therefore, that plaintiff was allowed a comparable amount of time to remedy the problems within his store.

Viewing the evidence in totality, the court concludes plaintiff has failed to demonstrate that defendant's proffered explanations are mere pretext for retaliation.  The "plan of action," the failure by plaintiff to remedy his store's problems within the time specified in the "decision-making day write-up," and the employee opinion survey all show that the work for which plaintiff was responsible was not performed properly while he was store manager.  Because plaintiff fails to rebut defendant's

---

[68] *See* note 65 supra.

[69] See Plaintiff's Deposition Exhibit 9.  The specific problems listed in the "decision-making day write-up" were scheduled to be completed between December 5th and December 10th.

32

nondiscriminatory reasons for his demotion with anything stronger

than vague, conclusory allegations, summary judgment for defendant

is appropriate, even if plaintiff had properly presented a *prima*

*facie* case.

**B. Retaliation Under § 1981**

In the complaint, plaintiff alleges that the same facts that

formed the basis of his Title VII retaliation claim also gave rise

to a violation of 42 U.S.C. § 1981.[70] That statutory provision

states, in pertinent part:

> All persons within the jurisdiction of the United
> States shall have the same right in every State and
> Territory to make and enforce contracts, to sue, be
> parties, give evidence, and to the full and equal benefit
> of all laws and proceedings for the security of persons
> and property as is enjoyed by white citizens, and shall
> be subject to like punishment, pains, penalties, taxes,
> liens, and exactions of every kind, and to no other.

42 U.S.C. § 1981(a). The court addresses plaintiff's § 1981 claims

separate from the Title VII claim. The Eleventh Circuit said in

*Little v. United Technologies, Carrier Transicold Division*, 103

F.3d 956, 961 (11th Cir. 1997), that "Title VII's prohibition

against retaliation for opposition to conduct ... is not identical

to the kind of discrimination proscribed by § 1981." The court

further pointed out that § 1981 is "concerned with racial

---

[70] Complaint at 1 ¶ 1.

33

discrimination in the making and enforcement of contracts." *Id.*
(citing *Johnson v. Railway Express Agency, Inc.*, 421 U.S. 454, 459,
95 S.Ct. 1716, 1720, 44 L.Ed.2d 295 (1975); *Jones v. Alfred H.
Mayer Co.*, 392 U.S. 409, 436, 88 S.Ct. 2186, 2201, 20 L.Ed.2d 1189
(1968)).

In the instant action, plaintiff does not suggest or allege
that the retaliation allegedly levied against him was due to his
race.   In other words, plaintiff does not allege Wal-Mart
discriminated against him because he was white.  Plaintiff's claims
are grounded solely in the opposition clause of Title VII and are
unrelated to the concerns set forth in the language of § 1981.
Therefore, this court is of the opinion that plaintiff has failed
to establish a *prima facie* case with respect to his § 1981 claim.

## C.  Constructive Discharge

"To  prove  constructive  discharge,  the  employee  must
demonstrate that [his] working conditions were so intolerable that
a reasonable person in [his] position would be compelled to
resign."  *Kilgore v. Thompson & Brock Management, Inc.*, 93 F.3d
752, 754 (11th Cir. 1996)(quoting *Steele v. Offshore Shipbuilding,
Inc.*, 867 F.2d 1311, 1317 (11th Cir. 1989)).  The Eleventh Circuit
has said, "[t]he general rule is that if the employer deliberately
makes an employee's working conditions so intolerable that the

34

employee is forced into an involuntary resignation, then the employer ... is as liable for any illegal conduct involved therein as if it had formally discharged the aggrieved employee." *Doe v. Dekalb County School District*, 145 F.3d 1441, 1450 (11th Cir. 1998)(quoting *Young v. Southwestern Savings and Loan Association*, 509 F.2d 140, 144 (5th Cir. 1975)(internal quotation marks omitted)). The court went further to say, "[i]n assessing constructive discharge claims, we do not consider a plaintiff's subjective feelings about his employer's actions. Rather, we determine whether a reasonable person in [the plaintiff's] position would be compelled to resign." *Doe*, 145 F.3d at 1450 (citatin and internal quotation marks omitted).

Plaintiff has failed to raise a material question of fact as to why his employment was so intolerable. Plaintiff alleges that, from the moment he reported Sandlin's discriminatory conduct, he was subjected to a constant stream of retaliatory actions which culminated with his demotion and transfer to the Fayetteville, Tennessee Wal-Mart. As stated previously, defendant has presented legitimate nondiscriminatory reasons for its action against plaintiff. Moreover, upon plaintiff's demotion, defendant transferred him to the closest facility which had an opening for an assistant manager.

In the opinion of this court, a reasonable person, faced with

35

Wal-Mart's conduct, would not feel compelled to resign.   A

reasonable person would have filed an EEOC charge, and pursued this

lawsuit without resigning his position.   That plaintiff chose to

resign rather than endure does not entitle him to recover for his

losses as a result of his choice.

## IV. CONCLUSION

For  the  foregoing  reasons,  this  court  concludes  that

defendant's motion for summary judgment is due to be granted.   An

appropriate order consistent with this memorandum opinion will be

issued contemporaneously herewith.

DONE this $\underline{6^{th}}$ day of November, 1998.

United States District Judge

36